**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **IN RE IPIX CORPORATION,** ) | |
| ) | |
| **Debtor** ) | **Case No. 06-10856-RGM** |
| ) | **Chapter 7** |
| _____ ) | |
| ) | |
| **Iroquois Master Fund, Ltd.** ) | **Ad. Proc. No._____** |
| ) | |
| **Plaintiff** ) | |
| **v.** ) | |
| ) | |
| **IPIX Corporation** ) | |
| ) | |
| **and** ) | |
| ) | |
| **Ms. Clara M. Conti,** ) | |
| **in her capacity as President** ) | |
| **of IPIX Corporation** ) | |
| _____ ) | |

## COMPLAINT

**COMES NOW** the Plaintiff, Iroquois Master Fund, Ltd. ("IMF"), by counsel, complaining of the Defendant, IPIX Corporation ("IPIX" or the "debtor"), and respectfully represents to the Court as follows:

Roy M. Terry, Jr., VSB No. 17764
Douglas Scott, VSB No. 28211
John C. Smith, VSB No. 44556
DurretteBradshaw, PC
600 East Main Street, 20th Floor
Richmond, Virginia 23219
Counsel for Iroquois Master Fund, Ltd.

**Jurisdiction and Parties.**

1. On July 31, 2006 (the "Petition Date"), the Debtor commenced a voluntary case in this Court under Chapter 7 of the Bankruptcy Code.

2. This action is filed pursuant to Fed.R.Bankr.P. 7001(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(B).

3. The debtor was a publicly-traded Delaware corporation with its chief place of business located in the Commonwealth of Virginia. The debtor's primary business prior to the Petition Date involved high resolution video camera technology. The debtor no longer operates its business in the wake of the filing of the Chapter 7 case, except to the extent authorized by this Court.

4. Ms. Clara M. Conti ("Conti") is a natural person residing in the Commonwealth of Virginia. At all times mentioned in the Complaint, Conti was the president and chief operating officer of the debtor, and in doing the things alleged in this Complaint, Conti was acting in her capacity as president and chief operating officer of the debtor.

5. IMF is the agent of certain lenders (the "Lenders") who extended $5,000,000 in secured debt to the debtor in a transaction that closed on June 26, 2006.

**The Transaction**

6. Effective June 26, 2006, the debtor entered into certain financial transactions (the "Transaction") with the Lenders through their agent, IMF. The Transaction was set

forth in, *inter alia*: (a) the Securities Purchase Agreement (the "Purchase Agreement"); (b) the Security Agreement (the "Security Agreement"); (c) a series of Senior Convertible Notes due June 26, 2011, totaling $5.0 million dollars ($5,000,000.00 USD)(the "Notes"); and (d) a UCC Financing Statement, Form UCC-1, executed by the debtor and recorded in Delaware on June 26, 2006 (the "UCC-1")(collectively, the "Loan Documents"). True copies of the aforementioned documents and the rest of the documents constituting the closing documents for the Transaction are attached hereto and are incorporated herein by reference (collectively, the "Transaction Documents").

7. The debtor is in default pursuant to the terms and conditions of the Loan Documents.

### The Warranties and Representations.

8. Certain warranties and representations were made by the debtor in the Purchase Agreement to induce IMF to extend credit to the debtor. Some of the warranties and representations made by the debtor to IMF include the following:

(a) **SEC Reports; Financial Statements.** The debtor warranted that it had filed all reports it was required to file under the Securities Act and the Exchange Act for the immediate previous two year period, and that those reports (and all the Schedules to the Purchase Agreement) complied in all material respects with the requirements of the Securities Act and the Exchange Act, and the rules and regulations promulgated thereunder. The debtor further warranted that none of the SEC Reports "when filed, contained any

3

untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made", not misleading. Purchase Agreement, ¶ 3.1(h).

(b) **Material Changes.** The debtor warranted that, except as specifically disclosed within the SEC Reports[1] or contained in Schedule 3.1(i) attached to the Purchase Agreement, that "(i) there has been no event, occurrence or development that, individually or in the aggregate, has had or that could result in a Material Adverse Effect[2], (ii) the Company has not incurred any liabilities (contingent or otherwise other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statement according to GAAP…)". Purchase Agreement, ¶ 3.1(i).

(c) **Absence of Litigation**. The debtor warranted that "[o]ther than described in the in the SEC Reports, there is no action [or] suit…pending or, to the knowledge of the Company, threatened… which: (i) adversely affects or challenges the legality, validity or enforceability or any of the Transaction Documents… or (ii) could, if there were an unfavorable decision, individually or in the aggregate, have or result in a Material Adverse Effect." Purchase Agreement, ¶ 3.1(j).

---

[1] "SEC Reports" is a defined term in the Purchase Agreement that means all the reports the debtor was required by law to file with the SEC for a the two year period prior to June 23, 2006.

[2] "Material Adverse Effect" is also a defined term in the Purchase Agreement. The phrase is defined as an event, occurrence or development that could "(i) adversely affect the legality, validity or enforceability of the Transaction Documents, (ii) have or result in a material adverse effect on the results of operations, assets, prospects, business or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) adversely impair the Company's ability to perform fully on a timely basis its obligations under any Transaction Document."

(d)     **Patents and Trademarks**.  The debtor warranted that "[o]ther than described in the SEC reports, the Company… [has, or has rights to use] all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, licenses and other similar rights that are necessary or material for use in connection with their respective businesses as described in the SEC Reports and which failure to so have could have a Material Adverse Effect…. to the knowledge of the Company, all such Intellectual Property Rights are enforceable."  Purchase Agreement, ¶ 3.1(o).

(e)     **Solvency.**     The debtor warranted that "…(i) the Company's fair saleable value of its assets exceeds the amount that will be required to be paid on or in respect of the Company's existing debts and other liabilities (including known contingent liabilities) as they mature during the current fiscal year; (ii) the Company's assets do not constitute unreasonably small capital to carry on its business for the current fiscal year as now conducted and proposed to be conducted…and (iii) assuming (A) the liquidation of assets includes receipts of material payment for intellectual property that is not currently on the Company's balance sheet and (B) that forced liquidation of inventory assets would not adversely affect the realizable value of that inventory when compared to its carrying value and the sale of inventory in the ordinary course of business, the current cash flow of the Company, together with the proceeds the Company would receive were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to

pay all amounts on or in respect of its debts when such amounts are required to be paid." Purchase Agreement, ¶ 3.1(s).

    (f)    **<u>Disclosure</u>**.    The debtor warranted that "[a]ll disclosure provided to the Lenders regarding the Company, its business and the transactions contemplated hereby, including the Schedules to this Agreement, furnished by or on behalf of the Company are true and correct and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading." Purchase Agreement, ¶ 3.1(z).

## Developments Leading up to Bankruptcy

9.    Effective June 26, 2006, IMF loaned Five Million Dollars ($5,000,000.00 USD) to IPIX.

10.    On July 24, 2006, the IPIX Board of Directors met by conference telephone call. At that meeting, Conti announced that Michael Easterly ("Easterly") had resigned as an IPIX director, "effective immediately." Ms. Conti then announced that the company's independent accountants, Armanino McKenna, had also resigned. Both actions were "material events" that had to be reported to Nasdaq. Easterly's resignation rendered the IPIX Board non-compliant with Nasdaq listing requirements. IPIX's failure to maintain its Nasdaq listing constituted a material breach of the terms and conditions of the Loan Documents.

11.     Immediately thereafter, the directors reviewed the company's Directors and Officers insurance policy, and resolved to purchase a one year tail policy under the company's then current D&O policy.

12.     Finally, after discussion with counsel, the board approved a bankruptcy resolution ("Bankruptcy Resolution") approving the filing by the company of a chapter 7 bankruptcy.

13.     Based upon IMF's information and belief, the Bankruptcy Resolution was prepared by counsel prior to the July 24, 2006 meeting of the IPIX Board of Directors.

14.     Based upon IMF's information and belief, Conti and the officers, directors and counsel for IPIX began discussions about putting the company into bankruptcy prior to the July 24, 2006 meeting of the IPIX Board of Directors.

15.     On July 31, 2006, IPIX filed a Chapter 7 liquidation bankruptcy ("Petition Date").

**The Grandeye Litigation**

16.     On or about March 4, 2005, Grandeye, Ltd. ("Grandeye"), filed a declaratory judgment action against IPIX seeking a declaration that its patents did not infringe certain IPIX patents and for various money damages, Case No. 2:05-cv-00134, in the U.S. District Court for the Eastern District of Virginia (the "Patent Case"). In due course, the Patent Case was transferred to the Norfolk Division and was assigned to District Judge Walter D. Kelly, Jr.

17. On or about January 18, 2006, Judge Kelly heard oral argument on the dispositive motions filed by Grandeye and IPIX in the Patent Case.

18. On or about February 14, 2006, Judge Kelly informed the parties' counsel during a telephone conference that "it was his intention to grant summary judgment [on the non-infringement claims] in Grandeye's favor."

19. Among the counsel representing IPIX in the Patent Case is Winston & Strawn, LLP.

20. Winston & Strawn, LLP, also represented IPIX in the Transaction that closed on June 26, 2006, in which IMF facilitated the Five Million Dollar loan to IPIX. Winston & Strawn, LLP, was IPIX's agent with regard to the Patent Case and the IMF loan to IPIX.

21. According to Exhibit 4 to the *Motion for Relief from the Automatic Stay Provisions of 11 U.S.C. § 362(a)* filed by Grandeye in IPIX's Chapter 7 case, the patents at issue in the Patent Case constitute a significant portion of IPIX's patent portfolio.

22. Entry of Summary Judgment by Judge Kelly on the issue of non-infringement in favor of Grandeye in the Patent Litigation would constitute a Material Adverse Effect on the value of the IPIX patent portfolio, property in which IMF holds a perfected collateral security interest.

23. IPIX did not disclose Judge Kelly's statement of his intention to grant summary judgment on the non-infringement claims in Grandeye's favor to the SEC or to IMF before or after the closing of the Transaction.

24. Based upon IMF's information and belief, immediately prior to the Transaction, IPIX desperately was in need of cash. IPIX solicited widely at that time for a Ten Million Dollar ($10,000,000.00 USD) loan, without success.

25. Based upon IMF's information and belief, if IPIX's patent portfolio were significantly impaired, as it would be if Judge Kelly ruled that Grandeye did not infringe upon IPIX's patents, IPIX would be rendered insolvent, as that term is defined in the ¶ 3.1(s) of the Purchase Agreement.

26. Based upon IMF's information and belief, IPIX's failure to disclose Judge Kelly's statement of his intention to grant summary judgment on the non-infringement claims in Grandeye's favor to the SEC constitutes an omission of a necessary material fact required to be disclosed to the SEC, in violation of ¶ 3.1(h) of the Purchase Agreement.

27. Based upon IMF's information and belief, Judge Kelly's statement of his intention to grant summary judgment on the non-infringement claims in Grandeye's favor constitutes an event, occurrence or development that could result in a Material Adverse Effect, the failure of which to disclose constitutes a violation of ¶ 3.1(h) of the Purchase Agreement.

28. Based upon IMF's information and belief, IPIX failed to disclose to the SEC or to IMF following Judge Kelly's statement of his intention to grant summary judgment on the non-infringement claims in Grandeye's favor the fact that the entry of such an

unfavorable decision in the patent Litigation could result in a Material Adverse Effect, in violation of ¶ 3.1(j) of the Purchase Agreement.

29. Based upon IMF's information and belief, Judge Kelly's statement of his intention to grant summary judgment on the non-infringement claims in Grandeye's favor rendered materially untrue IPIX's warranty that it had the lawful right to use all of its patents because, to the knowledge of the Company, some of those rights would shortly become unenforceable, in violation of ¶ 3.1(o) of the Purchase Agreement.

30. Based upon IMF's information and belief, IPIX failed to fully and accurately provide true and correct information regarding the IPIX patent portfolio after Judge Kelly's statement of his intention to grant summary judgment on the non-infringement claims in Grandeye's favor or, by omitting disclosure of that statement, rendered other statements made by IPIX misleading, in violation of ¶ 3.1(z) of the Purchase Agreement.

## Count One: Actual Fraud

31. IMF hereby incorporates by reference as if fully set out the allegations contained in ¶¶ 1-30 above, inclusive.

32. Effective June 26, 2006, Conti, in her capacity as an officer of the debtor, made the representations set forth in ¶ 8 above. Those representations were false when Conti made them, and she knew that they were false when made because the debtor knew that Judge Kelly had stated his intention to grant summary judgment on the non-infringement claims in Grandeye's favor on February 14, 2006.

33. Conti, in her capacity as an officer of the debtor, made the representations described above in ¶ 8 with the intent and purpose of defrauding IMF and for the purpose of inducing IMF to close the Transaction to loan Five Million Dollars to IPIX. In the alternative, Conti and the debtor made such representations recklessly. According to IMF's information and belief, IPIX desperately needed funds, and Conti and the debtor believed that IMF would not close the Transaction if the value of the IPIX patent portfolio were known by IMF to be at risk.

34. Conti, in her capacity as an officer of the debtor, made the representations described above in ¶ 8 with full knowledge that IMF was relying upon the truthfulness of the disclosures made by the debtor in the Purchase Agreement in extending the loan to IPIX.

35. IMF's reliance upon Conti's and the debtor's false and misleading statements was reasonable, and it relied upon those statements to its detriment.

### Count Two: Negligent Misrepresentation

36. IMF hereby incorporates by reference as if fully set out the allegations contained in ¶¶ 1-35 above, inclusive.

37. Conti and the debtor were under a duty to exercise reasonable care in making the representations set forth in ¶ 8 above because of the relationship of trust and reliance with IMF created by the contract between IMF and IPIX.

38. Conti and the debtor violated their duty to exercise reasonable care in making the representations contained in ¶ 8 above because they negligently made representations

Case 06-01170-RGM    Doc 1    Filed 10/18/06   Entered 10/18/06 16:52:03    Desc Main
                            Document      Page 12 of 13

that were materially untrue and incomplete when made. Conti and the debtor, by exercise of ordinary care, should have known that such representations were materially untrue and incomplete when made.

39. Because of this relationship of trust and confidence, IMF was entitled to rely upon the representations made by IPIX.

40. IMF's reliance upon Conti's and the debtor's negligently made false and misleading statements was reasonable, and it relied upon those statements to its detriment.

### Damages

41. As a direct and proximate cause of the conduct of the defendants as above, IMF is entitled to rescind the Transaction and to recover the $5,000,000.00 USD that IPIX fraudulently induced IMF to pay to IPIX.

42. The debtor's petition and schedule allege that the debtor possessed $3,305,426.68 in a bank account on the Petition Date. IMF alleges, based upon its information and belief, that those funds are the residuum of the $5,000,000 that IMF loaned to IPIX, and that IMF can "trace" its funds into the IPIX bank account.

43. IMF is entitled to a declaration that IMF had on the Petition Date, and possesses at present, a constructive trust on the funds in the IPIX bank account that IMF can trace into that account. The constructive trust was imposed on these funds by equity on June 26, 2006, and such funds do not constitute property of the bankruptcy estate.

**WHEREFORE**, IMF prays for entry of a judgment against defendants in the sum of $5,000,000.00, plus pre-judgment and post-judgment interest; for the Court to impose a constructive trust in its favor over the funds contained in the debtor's bank accounts; for such funds subject to the constructive trust be turned over to the Plaintiff; and for such other and further relief as may be just and proper.

Respectfully submitted, this the 18th day of October, 2006.

IROQUOIS MASTER FUND, LTD.,<br>By Counsel

/s/ Douglas Scott
Roy M. Terry, Jr., VSB No. 17764
Douglas Scott, VSB No. 28211
John C. Smith, VSB No.44556
DurretteBradshaw, P.C.
600 East Main Street, 20th Floor
Richmond, Virginia 23219
☎804.775.6900
🗎 804.775.6911
Counsel for Iroquois Master Fund, Ltd.

F:\I\IPIX Corporation\IPIX Complaint 10 18 06 Final.doc